**In re TOYS "R" US–DELAWARE, INC.— FAIR AND ACCURATE CREDIT TRANSACTIONS ACT (FACTA) LITIGATION.**

**Nos. MDL 08–01980 MMM (FMOx), CV 06–08163 MMM (FMOx), CV 08–06645 MMM (FMOx).**

United States District Court, C.D. California.

Signed Jan. 11, 2013.

Clinton J. McCord, Edwards Wildman Palmer LLP, Los Angeles, CA, Michael R. Dockterman, Edwards Wildman Palmer LLP, Chicago, IL, for Toys "R" Us–Dela-

ware, Inc.—Fair and Accurate Credit Transactions Act (FACTA) Litigation.

### ORDER GRANTING PLAINTIFFS' MOTIONS TO CERTIFY CLASSES

MARGARET M. MORROW, District Judge.

On December 21, 2006, plaintiffs Nicola Edwards and James Schley filed an action in this court against defendant Toys "R" Us ("Toys"), alleging that it had violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.[1] Specifically, plaintiffs asserted that Toys had violated the Fair and Accurate Credit Transactions Act ("FACTA"), which requires that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or the transaction." 15 U.S.C. § 1681c(g). Plaintiffs sued on behalf of a class of consumers who received receipts from Toys that did not comply with FACTA (the *"Edwards"* plaintiffs").

On May 21, 2008, Gregory J. Ellis filed a similar action that was assigned to Judge William T. Hart of the Northern District of Illinois.[2] Like Edwards and Schley, Ellis sought to represent a class of consumers who received a receipt from Toys that did not comply with FACTA (the *"Ellis"* plaintiffs"). On October 9, 2008, the United States Judicial Panel on Multidistrict Litigation transferred the Ellis action to this court for consolidated pretrial proceedings.[3]

On March 8, 2010, the Ellis and Edwards plaintiffs filed separate motions for class certification.[4] Toys separately opposed the mo-

---

1. Complaint ("Edwards Complaint"), CV 06–08163 MMM (FMOx), Docket No. 1 (Dec. 21, 2006).

2. Complaint ("Ellis Complaint"), CV 08–6645 MMM (FMOx), Docket No. 3 (May 21, 2008).

3. Transfer Order, CV 08–6645 MMM (FMOx), Docket No. 1 (Oct. 9, 2008).

4. Plaintiff's Motion for Class Certification ("Ellis Motion"), MDL 08–1980 MMM (FMOx), Docket No. 43 (Mar. 8, 2010); Memorandum of Law in

Support of Plaintiffs Nicola Edwards' and James Schley's Notice of Motion and Motion for Class Certification ("Edwards Motion"), MDL 08–1980 MMM (FMOx), Docket No. 45 (Mar. 8, 2010). See also Declaration of Chant Yedalian in Support of [Edwards] Plaintiffs' Motion for Class Certification ("Yedalian Decl."), MDL 08–1980 MMM (FMOx), Docket No. 46 (Mar. 8, 2010); Declaration of J. Mark Moore in Support of Plaintiffs Nicola Edwards' and James Schley's Motion for Class Certification ("Moore Decl."), MDL 08–1980 MMM (FMOx), Docket No. 47

tions on April 5, 2010.[5] On April 26, 2010, the Edwards and Ellis plaintiffs filed separate reply briefs.[6] On August 17, 2010, the court denied the motions for class certification.[7] Three days later, the parties filed a stipulation to stay the case pending decision by the Ninth Circuit of *Bateman v. American Multi–Cinema, Inc.*[8] Following decision of *Bateman*, the parties requested a further stay so that they could mediate the consolidated actions.[9] The stay was lifted in August 2011.[10]

In its order lifting the stay, the court directed the parties to meet and confer and file a joint report setting forth their respective positions as to whether the court should certify a class or classes following the Ninth

Circuit decision in *Bateman*. See *Bateman v. American Multi–Cinema, Inc.*, 623 F.3d 708 (9th Cir.2010).[11] On October 17, 2011, Toys filed a supplemental brief discussing *Bateman's* impact on the class certification decision.[12] The Edwards and Ellis plaintiffs filed separate supplemental briefs.[13] Thereafter, the parties, and ultimately the court, engaged in further, unsuccessful efforts to mediate the case. The renewed motions for class certification are now before the court for decision.

## I. FACTUAL BACKGROUND

Both the *Edwards* and *Ellis* actions involve a period of time in 2006 during which Toys printed more than the last four digits of

(Mar. 8, 2010); Request for Judicial Notice in Support of Plaintiffs Nicola Edwards' and James Schley's Motion for Class Certification ("Edwards' RJN"), MDL 08–1980 MMM (FMOx), Docket No. 48 (Mar. 8, 2010); Declaration of Douglas A. Linde in Support of Plaintiffs Nicola Edwards' and James Schley's Motion for Class Certification ("Linde Decl."), MDL 08–1980 MMM (FMOx), Docket No. 49 (Mar. 8, 2010).

5. Toys "R" Us' Opposition to Plaintiffs Nicola Edwards' and James Schley's Motion for Class Certification ("Edwards Opp."), MDL 08–1980 MMM (FMOx), Docket No. 52 (Apr. 5, 2010); Toys "R" Us' Opposition to Plaintiff Gregory J. Ellis' Motion for Class Certification ("Ellis Opp."), MDL 08–1980 MMM (FMOx), Docket No. 54 (Apr. 5, 2010). See also Declaration of Clinton J. McCord in Support of Toys "R" Us' Opposition to Plaintiffs Nicola Edwards' and James Schley's Motion for Class Certification ("McCord/Edwards Decl."), MDL 08–1980 MMM (FMOx), Docket No. 53 (Apr. 5, 2010); Declaration of Clinton J. McCord in Support of Toys "R" Us' Opposition to Gregory J. Ellis' Motion for Class Certification ("McCord/Ellis Decl."), MDL 08–1980 MMM (FMOx), Docket No. 55 (Apr. 5, 2010); Declaration of Mari J. Frank in Support of Defendant's Opposition to Plaintiffs' Motions for Class Certification ("Frank Decl."), MDL 08–1980 MMM (FMOx), Docket No. 56 (Apr. 5, 2010).

6. Plaintiff's Reply to Toys "R" Us' Opposition to Gregory J. Ellis' Motion for Class Certification ("Ellis Reply"), MDL 08–1980 MMM (FMOx), Docket No. 58 (Apr. 26, 2010); Reply Memorandum in Support of Plaintiffs' Nicola Edwards' and James Schley's Motion for Class Certification ("Edwards Reply"), MDL 08–1980 MMM (FMOx), Docket No. 68 (Apr. 26, 2010). See also Declaration of Nicola Edwards in Support of Class Certification ("Edwards Decl."), MDL 08–1980 MMM (FMOx), Docket No. 60 (Apr. 26,

2010); Declaration of James Schley in Support of Class Certification ("Schley Decl."), MDL 08–1980 MMM (FMOx), Docket No. 61 (Apr. 26, 2010); Corrected Supplemental Declaration of J. Mark Moore in Support of Plaintiffs Nicola Edwards' and James Schley's Motion for Class Certification ("Moore Supp. Decl."), MDL 08–1980 MMM (FMOx), Docket No. 64 (Apr. 26, 2010); Declaration of Jon D. McDowall in Support of Plaintiffs' Motion for Class Certification ("McDowall Decl."), MDL 08–1980 MMM (FMOx), Docket No. 65 (Apr. 26, 2010).

7. Order Denying Class Certification ("Class Order"), MDL 08–1980 MMM (FMOx), Docket No. 100 (Aug. 17, 2010).

8. Stipulation to Stay Case pending Decision by Ninth Circuit in *Bateman v. AMC*, Docket No. 101 (Aug. 20, 2010).

9. Stipulation to Stay Case pending Mediation, Docket No. 106 (Dec. 27, 2010).

10. Order Lifting Stay; Setting Scheduling Conference; Directing Parties to File Joint Report Addressing Specific Questions, Docket No. 110 (Aug. 3, 2011).

11. Minute Order in Chambers Lifting Stay, Setting Scheduling Conference, Directing Parties to File Joint Report, MDL 08–1980 MMM (FMOx), Docket No. 110 (Aug. 3, 2011).

12. Memorandum in Opposition to Class Certification (Supplemental Brief re: the *Bateman* Decision) ("Toys Supp. Brief"), MDL 08–1980, Docket No. 120 (Oct. 17, 2011).

13. Brief Filed by Plaintiff Gregory Ellis ("Ellis Supp. Brief"), MDL 08–1980, Docket No. 121 (Nov. 14, 2011); Supplement to Motion to Certi-

consumers' credit card numbers on its customer receipts. The court found the following facts undisputed in deciding a motion for summary judgment in the *Edwards* matter:

For seven years, Toys has collaborated with NCR Corporation ("NCR") to implement upgrades to its cash register software. *Edwards v. Toys "R" Us*, 527 F.Supp.2d 1197, 1203 (C.D.Cal.2007). NCR is an outside consultant that works closely with Toys—so closely that NCR has stationed one of its employees in Toys' offices to assist with software issues. *Id.* By the middle of 2005, all of the cash register systems in Toys' stores were programmed to print only the last four digits of debit and credit card numbers and to omit expiration dates on electronically printed customer receipts. *Id.* Beginning in the middle of 2006, Toys initiated a plan to truncate card numbers on internal corporate displays so that only the first six and last four digits of customer card numbers were visible. *Id.* The internal displays included "call info chits" used internally for customer service purposes. *Id.*[14] A team of NCR and Toys personnel developed an appropriate software upgrade to modify the internal displays and generated a change request ("CR"). Toys then engaged NCR to develop the software and implement the upgrade. NCR completed its work by October 27, 2006. *Id.* at 1204.

In the process of upgrading Toys' cash register software to truncate the credit and debit card information shown on internal displays, Jeanette Lee, an NCR employee who worked exclusively from Toys' main office, revised the CR to state that "all guest receipts [would] also contain the same masking of the first 6 and the last 4 digits." *Id.* By making this revision, Lee effectively added information to external customer receipts that had been previously suppressed. Before implementing the software modification, Lee contacted two Toys employees and requested approval to apply the change to all receipts.[15] On August 24, 2006, Toys' Point of Sale Systems team held a meeting; the minutes of this meeting state: "CR–615, this is the CR which masks the credit card on the referral chit.... The same masking change will also be used on other guest receipts." *Id.*

Although the software was tested by both NCR and Toys' user acceptance group, the receipts generated by the new software were never compared with the original conforming receipts. Beginning in late October 2007, the software was implemented and caused more than the last five digits of customer credit and debit card numbers to appear on over 29 million printed customer receipts. *Id.* at 1204–05.

On December 27, 2007, Toys received a copy of the *Edwards* complaint. Toys promptly took action to cure the violation. It assembled a team to run tests on cash registers, which confirmed that the registers were printing more than the last four digits of customers' card numbers. The team developed and implemented a software change to correct the problem; by January 5, 2008, all of Toys' cash registers nationwide had been brought into compliance with FACTA. *Id.* at 1205.

The court found there were four disputed issues that precluded the entry of summary judgment in the *Edwards* action: (1) whether Lee could be characterized as Toy's agent and thus whether her intent could be imputed to Toys; (2) whether Lee communicated and whether Toys' employees understood that her proposed change would affect customer as opposed to internal receipts; (3) whether the change to customer receipts was discussed during the weekly Point of Sale Systems meeting; and (4) whether knowledge should be imputed to Toys given that test receipts generated prior to implementa-

fy Class ("Edwards Supp. Brief"), MDL 08–1980, Docket No. 123 (Nov. 14, 2011).

**14.** Call info chits are documents printed by customer service personnel when a credit or debit card transaction is denied; the chits are not provided to the customer and are used strictly for internal purposes. FACTA's requirement that no more than five numbers be printed on a customer receipt is applicable only to external receipts produced for customers. *Id.* at 1203 n. 13.

**15.** Toys does not dispute that Lee contacted Amy Testino and Kevin Walton, two members of the "cross-functional" teams responsible for the change request. It does, however, dispute the import and effect of the calls. *Id.* at 1204 n. 19.

tion displayed ten digits of customers' credit card numbers. *Id.* at 1205–07.

Six months after the court decided the *Edwards* summary judgment motion, the *Ellis* action was filed in the Northern District of Illinois. Five months later, the U.S. Judicial Panel on Multidistrict Litigation consolidated the two actions for pretrial purposes. *In re: Toys "R" Us–Delaware, Inc., Fair and Accurate Credit Transactions Act (FACTA) Litigation,* 581 F.Supp.2d 1377 (U.S.Jud.Pan. Mult.Lit.2008). The panel concluded that "[e]ach action involves allegations that defendant's printing of certain credit and debit card information on customer receipts violated the Fair and Accurate Credit Transactions Act." *Id.* at 1377.

On March 8, 2010, Edwards and Ellis filed separate motions to certify a class of consumers who shopped at Toys and had more than four digits printed on their credit card receipt. Specifically, Edwards sought to certify a class defined as:

> "All consumers to whom, after December 3, 2006, Defendant provided an electronically printed receipt at the point of a sale or transaction in California, on which receipt Defendant printed more than the last five digits of the person's credit or debit card number (the "California Class")."

Ellis sought to certify a class defined as:

> "All persons in the United States, except California, to whom Defendant provided an electronically-printed receipt at the point of a sale or transaction from October 27, 2006 through January 5, 2007 and which receipt displayed more than the last five digits of the purchaser's credit card or debit card number (the "Nationwide Class")."[16]

The court declined to certify the classes, finding that a class action was not a superior vehicle for resolving plaintiffs' disputes.[17] It noted that no putative class members had alleged any claim of actual injury,[18] and concluded, based on the evidence adduced, that

the printing of the first six digits, in addition to the last four, caused no actual harm to putative class members and resulted in a negligible increased risk of harm.[19] As a consequence, the court found that the range of possible statutory damages award—$2.9 billion to $29 billion—was disproportionate to the actual harm caused. It engaged in a thorough review of the Ninth Circuit's decision in *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226 (9th Cir.1974), and decisions addressing certification of FACTA classes, and found that a majority of courts agreed that a class action was not superior when this type of disproportionality between actual injury and potential damages existed.[20]

## II. DISCUSSION

### A. Legal Standard Governing Class Certification

A district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED.R. CIV.PROC. 23(a).

 In addition, a district court must find either that at least one of the several conditions set forth in Rule 23(b) is met. As the Supreme Court has explained:

> "Rule 23(b)(1) allows a class to be maintained where 'prosecuting separate actions by or against individual class members would create a risk of' either '(A) inconsistent or varying adjudications,' or '(B) adjudications ... that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede[ ] their ability to protect their interests.' Rule 23(b)(3) states that a

---

**16.** Ellis Motion at 12–13. The *Edwards* and *Ellis* plaintiffs also seek to define subclasses of consumers at single stores in Culver City, California and Schaumberg, Illinois, respectively.

**17.** Class Order at 32–33.

**18.** *Id.* at 22.

**19.** *Id.* at 25.

**20.** *Id.* at 12–22.

class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Wal–Mart Stores, Inc. v. Dukes* [—— U.S. ——], 131 S.Ct. 2541, 2549 n. 2 [180 L.Ed.2d 374] (2011).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 2551. Thus, "[t]he party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir.), amended by 273 F.3d 1266 (9th Cir.2001); see also *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992). The class can be certified only if the court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone of Southwest v. Falcon*, 457 U.S. 147, 160–61, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).[21]

■ Although not specifically mentioned in Rule 23(a), there is an additional prerequisite to certification—that the class be ascertainable. See, e.g., *Lukovsky v. San Francisco*, No. C 05–00389 WHA, 2006 WL 140574, *2 (N.D.Cal. Jan. 17, 2006) ("'Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed,'" quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679–80 (S.D.Cal.1999)); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D.Cal.2002) ("Prior to class certification, plaintiffs must first define an ascertainable and identifiable class. Once an ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)" (citation and footnote omitted)); *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D.Cal.1998) (holding that a class definition must be "precise, objective and presently ascertainable"); *Bishop v. Saab Auto. A.B.*, No. CV 95–0721 JGD (JRx), 1996 WL 33150020, *4 (C.D.Cal. Feb. 16, 1996) ("To file an action on behalf of a class, the named plaintiffs must be members of the class that they purport to represent at the time the class action is certified. The named plaintiffs must also demonstrate that the class is ascertainable" (citation omitted)).[22]

Once the court determines that a class is ascertainable, it then must examine whether the class meets the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a). If these prerequisites are met, the court must next consider whether the class is maintainable under Rule 23(b). See, e.g., *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996) ("In order for a class action to be certified, the plaintiffs must establish the four prerequisites of Fed.

---

**21.** The Supreme Court has noted that "[f]requently ... 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes*, 131 S.Ct. at 2551.

**22.** See also, e.g., *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir.1989) (same), abrogated on other grounds by *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 477 (S.D.Ohio 2004) ("Before delving into the 'rigorous analysis' required by Rule 23, a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class"); *Robinson v. Gillespie*, 219 F.R.D. 179, 183 (D.Kan.2003) ("In determining whether to certify a class, the court begins with the proposed definition of the class" because "[a]bsent a cognizable class, determining whether Plaintiffs ... satisfy the other Rule 23(a) and (b) requirements is unnecessary" (internal quotations omitted)); *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 346 (S.D.Ga.1996) ("Before considering the requirements of Rule 23 ... a court must determine whether a class exists that can adequately be defined.... [C]lass definition is an implicit requirement which must be met before a Rule 23 analysis can be undertaken by the district court").

R.Civ.P. 23(a) and at least one of the alternative requirements of Fed.R.Civ.P. 23(b)").

■ Both Edwards and Ellis seek certification under Rule 23(b)(3). A class is maintainable under Rule 23(b)(3) when both "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and when "a class action is superior to other available methods for fair and efficient adjudication of the controversy." FED.R.CIV. PROC. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir.1998) (citing *Amchem Products*, 521 U.S. at 614–15, 117 S.Ct. 2231). The test presumes that the commonality requirement of Rule 23(a) has been met, and examines the "relationship between the common and individual issues." *Id.* In determining superiority, the court must consider the four factors set forth in Rule 23(b)(3): (1) the interest class members have in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy that has already been commenced by or against class members; (3) the desirability or undesirability of concentrating litigation of the claims in the particular forum; and (4) the difficulties that will likely be encountered in managing the suit as a class action. *Id.* at 1190–93.

### B. Superiority After *Bateman*

■ The primary issue raised by plaintiffs' renewed motions for class certification is whether the Ninth Circuit's decision in *Bateman* requires that the court reconsider its earlier order denying class certification on superiority grounds. Generally, "courts have discretion under Rule 23 to decline to certify a class action [on superiority grounds] when it would bring about 'undesirable result[s].'" *Vasquez–Torres v. McGrath's Publick Fish House, Inc.*, No. CV 07–1332 AHM (CWx), 2007 WL 4812289, *6 (C.D.Cal. Oct. 12, 2007) (quoting Rule 23 Advisory Committee Notes (1966)). In *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir.1974), the Ninth Circuit considered whether the superiority require-

ment of Rule 23(b)(3) precluded class certification of an antitrust class whose members had engaged in 400,000 to 800,000 transactions, generating excess commissions and treble damages in the amount of $1,875 per transaction, or an aggregate of at least $750,000,000 in damages. *Id.* at 234 & n. 5. The court noted that although these damages were contemplated by the statute, the "amounts [were] staggering." *Id.* In deciding the issue, the Ninth Circuit analogized to "class actions [that] have sought outrageous amounts in statutory penalty cases such as the $100 minimum under the Truth in Lending Act of 1968." *Id.* It found relevant the decision of Judge Marvin E. Frankel of the Southern District of New York in *Ratner v. Chemical Bank New York Trust Co.*, 54 F.R.D. 412 (S.D.N.Y.1972). Discussing Rule 23(b)(3), Judge Frankel concluded:

> "Students of the Rule have been led generally to recognize that its broad and open-ended terms call for the exercise of some considerable discretion of a pragmatic nature. Appealing to that kind of judgment, defendant points out that (1) the incentive of class-action benefits is unnecessary in view of the Act's provisions for a $100 minimum recovery and payment of costs and a reasonable fee for counsel; and (2) the proposed recovery of $100 each for some 130,000 class members would be a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant, for what is at most a technical and debatable violation of the Truth in Lending Act. These points are cogent and persuasive. They are summarized compendiously in the overall conclusion stated earlier: the allowance of this as a class action is essentially inconsistent with the specific remedy supplied by Congress and employed by plaintiff in this case. It is not fairly possible in the circumstances of this case to find the (b)(3) form of class action 'superior to' this specifically 'available [method]' for the fair and efficient adjudication of the controversy.'" *Ratner*, 54 F.R.D. at 416.

Prior to *Bateman*, the vast majority of district courts in the Ninth Circuit had determined that, under *Kline*, a class action was

not a superior vehicle for FACTA disputes, given the disparity between the potential statutory damages and the actual harm suffered by class members. See, e.g., *Azoiani v. Love's Travel Stops & Country Stores, Inc.*, No. CV 07–90 ODW (OPx), 2007 WL 4811627 (C.D.Cal. Dec. 18, 2007); *Vartanian v. Estyle, Inc.*, No. CV 07–0307 DSF (RCx), 2007 WL 4812286 (C.D.Cal. Nov. 26, 2007); *Saunders v. Trattoria*, No. CV 07–1060 SJO (PJWx), 2007 WL 4812287 (C.D.Cal. Oct. 23, 2007); *Price v. Lucky Strike Entm't Inc.*, No. CV 07–960–ODW (MANx), 2007 WL 4812281 (C.D.Cal. Aug. 31, 2007); *Najarian v. Avis Rent A Car Sys.*, No. CV 07–588–RGK (Ex), 2007 WL 4682071 (C.D.Cal. June 11, 2007). Only Judge James Selna had concluded otherwise, in *Medrano v. WCG Holdings, Inc.*, No. SACV 07–0506 JVS (RNBx), 2007 WL 4592113 (C.D.Cal. Oct. 15, 2007).

In *Bateman*, however, the court distinguished *Kline*, and determined that, in declining to certify a FACTA class, the district court had abused its discretion by relying on "the disproportionality between potential liability and the actual harm suffered, the enormity of the potential damages, [and] AMC's good faith compliance." 623 F.3d at 713. The court held that "none of these three grounds ... justified the denial of class certification on superiority grounds." *Id.*

The court first addressed the issue of disproportionality between the actual harm suffered by consumers and the potential damages award. It stated that the *Kline* court had concluded that the class action vehicle was not superior "not simply" because "potential liability would be disproportional to the harm incurred," but also because "such liability would be inconsistent with congressional intent in enacting the statutory damages provision." *Id.* at 715. The court noted

specifically the conclusion of the *Kline* court that " '[t]he intent of Congress under section 4 of the Clayton Act, 15 U.S.C. [§ ] 15, appears to have been to impose punishment upon the violator of section 1 of the Sherman Act for his own malefactions[,] not to subject him to vicarious liability by the coincidence of a class action for the staggering damages of the multitude.' " *Id.* at 716 (quoting *Kline*, 508 F.2d at 235). This comment by the *Bateman* court appears to suggest that the rationale for the holding in *Kline* was the fact that a class of defendants had been certified, each member of which was jointly and severally liable for the full amount of damages. *Id.* at 715. Ultimately, the *Bateman* court stated, "[t]he basis of *Kline's* conclusion was not simply that potential liability would be disproportional to the harm incurred, but rather that such liability would be inconsistent with congressional intent in enacting the statutory damages provision." *Id.* at 716.[23]

Based on this understanding of *Kline*, the *Bateman* court looked to the congressional intent behind FACTA.[24] It stated:

"We think it clear that the Rule 23(b)(3) superiority analysis must be consistent with the congressional intent in enacting a particular statutory damages provision. While Rule 23 affords district courts 'wide discretion' in deciding whether to certify a class, the district court was obliged to exercise that discretion in light of the objectives of FACTA." *Id.* at 716 (internal citation omitted).

The court therefore conducted a thorough review of the history and congressional intent behind FACTA. *Id.* at 717. Noting that the statute was enacted to "combat identity theft," *id.* at 717, the court determined that Congress had two primary purposes in

---

**23.** The *Bateman* court found ironic the fact that Judge Frankel's decision in *Ratner* had "played such a prominent role in shaping the scope of the Rule 23 superiority analysis." *Id.* at 715 n. 5. It noted that Judge Frankel had "specifically distanced himself from the 'sweeping pronouncements' about the role of Rule 23 made by the respective parties [in *Bateman* ], and instead emphasized his 'molecular purpose' to rule only on the 'specific case at hand.' 54 F.R.D. at 413." *Id.*

**24.** The court noted that Judge Frankel in *Ratner* had "also focused on whether the potentially enormous liability would be consistent with congressional intent in creating the statutory damages provision." *Id.* at 716 (citing *Ratner*, 54 F.R.D. at 414 ("[T]he allowance of thousands of minimum recoveries like plaintiff's would carry to an absurd and stultifying extreme the specific and essentially inconsistent remedy *Congress prescribed* as the means of private enforcement." (emphasis original to *Bateman* ))).

permitting the recovery of either actual or statutory damages under FACTA. First, it presumed that "statutory damages [were intended to] serve a compensatory function." *Id.* at 718. The court stated:

"That Congress provided a consumer the option of recovering either actual or statutory damages, but not both, supports the presumption that they serve the same purpose. We further note that Congress provided for punitive damages in addition to any actual or statutory damages, see 15 U.S.C. § 1681n(a)(2), which further suggests that the statutory damages provision has a compensatory, not punitive, purpose." *Id.*

Second, the court concluded that FACTA's actual and statutory damages provisions also serve a deterrent purpose, as they prevent "businesses from willfully making consumer financial data available, even where no actual harm results." *Id.*

Having determined that FACTA's statutory damages provision had both a compensatory and deterrent purpose, the *Bateman* court addressed whether these purposes are consistent with resolving disputes on a classwide basis. It observed:

"[T]he plain text of the statute makes absolutely clear that, in Congress's judgment, the $100 to $1000 range *is* proportionate and appropriately compensates the consumer. That proportionality does not change as more plaintiffs seek relief; indeed, the size of AMC's potential liability expands at exactly the same rate as the class size." *Id.* at 719 (emphasis original).

Additionally, the court stated, "[t]o the extent that statutory damages also serve a deterrent purpose, a court undermines that purpose in denying class certification on the basis of the proportionality of actual harm and statutory liability." *Id.* For both reasons, it concluded, seeking class-wide relief for FACTA violations is not inconsistent with Congress's purposes. *Id.* The court held:

"Despite Congress's awareness of the availability of class actions, it set no cap on the total amount of aggregate damages, no limit on the size of a class, and no limit on the number of individual suits that could be brought against a merchant. Allowing denial of class certification because of the sheer number of violations and amount of potential statutory damages would allow the largest violators of FACTA to escape the pressure of defending class actions and, in all likelihood, to escape liability for most violations.... To deny class certification based on the potential amount of damages as compared to the extent of harm presumes that Congress left it to the courts to evaluate the relative amount of liability necessary to serve the statute's compensatory and deterrent purposes.... Had Congress been sufficiently concerned about disproportionate damages as a result of class actions, it would have limited class availability or aggregate damages. Yet Congress did nothing of the sort and instead merely imposed a retroactive immunity for a sub-class of merchants who misunderstood FACTA's requirements [in the Clarification Act]." *Id.* at 719–20.[25]

As a result, the court concluded that the proportionality between statutory and actual damages was not an appropriate basis for denying class certification. *Id.* at 721.

The *Bateman* court next considered whether it was appropriate to deny class certification because certifying a class would potentially impose ruinous liability on the defendant. *Id.* The court noted first that, "[i]f the size of a defendant's potential liability alone was a sufficient reason to deny class certification, however, the very purpose of Rule 23(b)(3)—'to allow integration of numerous small individual claims into a single powerful unit'—would be substantially undermined." *Id.* at 722 (quoting *Blackie v. Barrack*, 524 F.2d 891, 899 (9th Cir.1975)). Rather, it stated, "whether the potential for enormous liability can justify a denial of class certification depends on congressional intent." *Id.* Citing its earlier analysis of congressional intent, the court concluded that

---

**25.** The Clarification Act was passed on 2008 to address merchants' misapprehension that truncating all but the last five digits of the account number while displaying the expiration date on a receipt was sufficient to comply with FACTA's requirements. See Clarification Act § 2(a)(3), 122 Stat. at 1565.

"allowing consideration of the potential enormity of any damages award would undermine the compensatory and deterrent purposes of FACTA." *Id.* The court noted that in other instances where Congress was concerned about the enormity of potential damages, it had imposed caps on aggregate liability. FACTA, by contrast, contains no such limitation. *Id.* Significantly, however, the court noted that the matter before it was "not a case where the defendant ha[d] argued or demonstrated that the potential liability would result in bankruptcy." *Id.* at 723. It "reserve[d] judgment as to whether a showing of 'ruinous liability' would warrant denial of class certification in a FACTA or similar action." *Id.*

## C. Whether a Class Action is Superior

Toys seizes on the *Bateman* court's reservation of judgment regarding cases of possible "ruinous liability," and asserts that, because it is facing potential damages that range from $2.9 billion to $29 billion, a class action is not a superior vehicle for resolving the dispute.[26] It argues alternatively that certification is not appropriate because an award of $2.9 billion or greater would constitute an unconstitutional punishment in light of the fact that no actual harm has been suffered.[27] Finally, Toys contends Congress did not intend for FACTA to imposing crippling liability on companies, and thus that certifying classes here would be contrary to Congressional intent.[28]

Plaintiffs argue, conversely, that *Bateman* is controlling and that under that decision, the court cannot consider the overall size of the potential damages award or whether it is proportional to the harm suffered in deciding the certification question.[29] They also assert that Toys has not demonstrated that it faces a threat of ruinous liability,[30] and that this is not the correct phase of the proceedings in which to determine whether any potential award is unconstitutionally excessive.[31] The court addresses each of these arguments in turn.

### 1. Ruinous Liability

Toys asserts first that certification will expose it to ruinous liability.[32] The *Bateman* court did not address how a court might measure when potential damages could be deemed ruinous. It noted, however, that "AMC's 2006 revenues were approximately $1.68 billion, with approximately $1.66 billion in costs and expenses," and also that "AMC's assets were worth approximately $4 billion as of 2007." 623 F.3d at 723. Other courts have used various measures when comparing potential damages to a defendant's financial resources. In *Stillmock v. Weis Markets, Inc.*, 385 Fed.Appx. 267, 279 (4th Cir. July 1, 2010) (Unpub. Disp.) (Wilkinson, J. concurring), Judge Wilkinson compared a potential $100 million to $1 billion award against the defendant's market capitalization. He noted that the company's "market capitalization at current prices is just over $900 million dollars.... [A] class action, if successful, will shatter the entire company into hundreds of thousands of $100 to $1,000 bits." In *Evans v. U-Haul Co. of California*, No. CV 07–2097–JFW (JCx), 2007 WL 7648595 (C.D.Cal. Aug. 14, 2007), the court compared potential statutory damages with the defendant's net worth, and concluded that damages would "range from twenty percent to two times Defendant's net income for fiscal year 2007." *Id.* at *5. See also *Blanco v. CEC Entm't Concepts L.P.*, No. CV 07–0559 GPS (JWJx), 2008 WL 239658, *2 (C.D.Cal. Jan. 10, 2008) ("In this case, if Plaintiff Blanco's class is certified, damages will range between $198,025,000 to $1,980,250,000 though Plaintiff admits that she incurred no actual harm and has not alleged actual harm to the class. This would completely swallow CEC's net income last year of $68,257,000"). In *Lopez*

---

**26.** Toys Supp. Brief at 2–3.

**27.** *Id.* at 3–5.

**28.** *Id.* at 6.

**29.** Edwards Supp. Brief at 4; Ellis Supp. Brief at 6.

**30.** Edwards Supp. Brief at 11; Ellis Supp. Brief at 9.

**31.** Edwards Supp. Brief at 18–19, n. 13; Ellis Supp. Brief at 15.

**32.** Toys Supp. at 3.

*v. KB Toys Retail, Inc.*, No. CV 07–144–JFW (CWx), 2007 U.S. Dist. LEXIS 82025, *14 (C.D.Cal. July 17, 2007) the court compared potential damages to the defendant's net worth, noting that even a $100 per violation award to members of a proposed FACTA class would amount to 600% of defendant's net worth.

Based on any of these measures, it is likely that Toys faces potentially catastrophic damages. Toys proffers evidence that its net worth and the net worth of its parent company was $117 million as of January 30, 2010.[33] Thus, the minimum amount of statutory damages Toys faces—$2.9 billion—is approximately 2,500% of its net worth. Even the California class that Edwards seeks to certify involves more than two million receipts and a potential statutory award of more than $200 million to $2 billion. If a "ruinous liability" exception exists, therefore, Toys could likely qualify.

The court need not ultimately decide whether Toys has adduced sufficient evidence that it faces ruinous liability, however, because based on the court's reading of *Bateman*, proof of potentially ruinous liability does not defeat class certification. The *Bateman* court's comments concerning ruinous liability were coupled with references to the standard the Ninth Circuit uses to evaluate Rule 23(f) petitions for interlocutory appeal of district court class certification orders. In that context, the court has guidelines for consideration of Rule 23(f) petitions. One of these asks whether "there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, *coupled with* a class certification decision by the district court that is questionable." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir.2005) (emphasis added). Here, based on its reading of

*Bateman*, the court cannot conclude that certifying the classes sought by Edwards and Ellis is "questionable."

■ Specifically, although the Ninth Circuit in dicta reserved whether a ruinous liability might warrant declining to certify a class, the balance of the opinion strongly indicates that the overall size of a potential award—whether or not it "ruins" the defendant—is not an appropriate basis on which to decline to certify a class. In reaching its conclusions, the *Bateman* court relied heavily on the absence of any provision in FACTA limiting or placing a cap on liability. The court noted that "[n]othing in the plain text of the statute or in its legislative history suggests that Congress intended to place a cap on potentially enormous statutory awards or to otherwise limit the ability of individuals to seek compensation for example." 623 F.3d at 722. As a result, it commented, "to limit class availability merely on the basis of 'enormous' potential liability that Congress explicitly provided for would subvert congressional intent." *Id.* at 723.

■ This reasoning defeats Toys' argument here. Whether or not doing so would be sound policy, Congress did not, either when it passed FACTA initially or when it amended the statute in 2008, cap potentially recoverable statutory damages. Nor did it create an exception for defendants facing "ruinous liability."[34] The *Bateman* court also noted that allowing courts to deny certification based on the size of the potential damages recovery inaccurately "presumes that Congress left it to the courts to evaluate the relative amount of liability necessary to serve the statute's compensatory and deterrent purposes." *Id.* at 719. In the absence of any statutory language or evidence of legislative intent indicating otherwise, and in the face of *Bateman*, the court cannot pre-

33. McCord/Edwards Decl., Exh. 5. Although the court afforded the parties an opportunity to file supplemental briefs in an order dated September 20, 2012, Toys did not provide updated financial information for fiscal or calendar year 2011, nor any net income information for 2011 or 2012.

34. As the *Bateman* court noted, Congress passed the Clarification Act at a time when there was already "heavy debate in the courts" as to whether potentially enormous liability defeats superior-

ity. 623 F.3d at 722. Thus, in the view of the *Bateman* court, the enactment of "the Clarification Act represented a prime opportunity for Congress to clarify its intent" had it wished to do so. Because it did not, the court concluded that Congress's silence showed it did not intend for courts to consider potential aggregate liability in deciding whether certification was appropriate. *Id.*

sume that Congress intended to place the survival of a defendant company ahead of the deterrent and compensatory purposes of FACTA. Rather, the court must read the statute as it exists, without any liability cap, and conclude that Congress intended that statutory damages could be recovered in a class action whatever the size of the defendant's aggregate liability.

Furthermore, as the *Bateman* court observed, the Supreme Court has specifically stated that a defendant's overall liability does not depend on whether or not a class is certified. See *id.* at 722 n. 8. In *Shady Grove Orthopedic Associates v. Allstate Insurance Co.*, 559 U.S. 393, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010), the Court addressed Allstate's argument that because New York law prohibited class actions in suits seeking penalties or statutory damages, district courts sitting in diversity were precluded from entertaining a class action seeking such relief. *Id.* at 1436. In support of its position, Allstate argued that permitting a class action to proceed was not substantively neutral, because it " 'transform[s] [the] dispute over a five hundred dollar penalty into a dispute over a five million dollar penalty.' " *Id.* at 1443. The Court did not agree:

> "Allstate's aggregate liability ... does not depend on whether the suit proceeds as a class action. Each of the 1,000–plus members of the putative class could (as Allstate acknowledges) bring a freestanding suit asserting his individual claim. It is undoubtedly true that some plaintiffs who would not bring individual suits for the relatively small sums involved will choose to join a class action. That has no bearing, however, on Allstate's or the plaintiffs' legal rights."

Following the reasoning of the Supreme Court in *Shady Grove*, any potentially ruinous liability Toys faces liability is not the result of the court's decision to certify a class or classes, but of the statute Toys allegedly violated. The company would face the same aggregate liability if each person who received a noncompliant receipt filed an individual action. In *Murray v. GMAC Mortgage Co.*, 434 F.3d 948, 951 (7th Cir.2006), which the Ninth Circuit cited with approval

in *Bateman*, the Seventh Circuit reviewed a district court's denial of class certification on the basis that "statutory damages, if awarded to a class, would be *ruinously high* " (emphasis added). The Seventh Circuit held that the district court had abused its discretion in denying certification, because the "reason that damages [could] be substantial ... [did] not lie in an 'abuse' of Rule 23 [but] ... in the legislative decision to authorize awards as high as $1,000 per person, 15 U.S.C. § 1681n(a)(1)(A), combined with GMACM's decision to obtain the credit scores of more than a million persons." *Id.* at 953. The circuit court stated that, even if certification did not appear desirable from a policy standpoint, "it [was] not appropriate to use procedural devices to undermine laws of which a judge disapproves," and that "[w]hile a statute remains on the books ... it must be enforced rather than subverted." *Id.* at 954. Thus, despite the possibility of ruinously high statutory damages, the court concluded that the class should have been certified.

The court has found only one post-*Bateman* case in which a district court declined to certify a class based on potentially ruinous liability. In *Rowden v. Pacific Parking Systems, Inc.*, 282 F.R.D. 581 (C.D.Cal.2012), the court declined to certify a class of plaintiffs who sued the city of Laguna Beach, California for noncompliant receipts received at parking facilities throughout the city. As one of several grounds for denying certification, the court noted that it would be unfair to "subject Laguna Beach to such burdensome class litigation and expose the city to such ruinous liability." *Id.* at 587. The court emphasized that the potential award of $15 million was "twice the balance of Laguna Beach's general fund reserves and more than this year's entire budget for the city's police department." *Id.* It concluded that exposing the city to liability of this magnitude would "compromise Laguna Beach's ability to respond to emergencies and provide necessary public services." *Id.* The court distinguished *Bateman*, stating:

> "In *Bateman*, a class action was brought against a billion-dollar movie theater company for allegedly printing receipts displaying eight digits of consumers' credit

card numbers in violation of FACTA. *Id.* at 711, 723. Here, in stark contrast, Mr. Martin seeks $15 million from a relatively small municipality for harmlessly printing the credit and debit card expiration dates on parking receipts." *Id.*

It appears that among the *Rowden* court's concerns was the specific effect certification would have on a municipality's ability to carry out governmental functions necessary for public safety and the health of its citizens.[35] The *Rowden* court implied that the matter before it was a somewhat unique case, in that it was "only aware of one other FACTA decision in the public context." *Id.* at 587 n. 8. Moreover, as the defendant in *Rowden* was a public entity, aggrieved consumers had alternative administrative remedies available that they could pursue. *Id.* at 586 ("An aggrieved consumer can also seek recovery through the administrative remedy available in the [California Governmental Claims Act]"). Because consumers could file individual suits or submit administrative claims to the city, the court concluded that "it [was] simply not credible to argue that a class action [was] the 'superior' method" of adjudicating the claims. *Id.* at 587. The court cited *Ratner* for the proposition that "[b]ecause of the specific, individual remedy available to individuals in FACTA, a class action would also be contrary to Congressional intent." *Id.* at 587 n. 7.

While the court, respectfully, does not agree with portions of the analysis of the *Rowden* court, it notes that the basis on which the court distinguished *Bateman* is inapplicable here. Like the defendant in *Bateman*, Toys is a private company. The case thus raises no concerns regarding public health and safety comparable to those considered by that court. Consequently, the court declines to follow the *Rowden* decision.

Finally, as discussed in greater detail *infra*, it is not necessary to decline to certify a class to obviate the potential for ruinous liability, because even if Toys ultimately faces the prospect of class action damages that would end its existence as a company, the court can reduce those damages at a later stage of the proceedings if it finds them unconstitutionally excessive. See *Murray*, 434 F.3d at 954 ("An award that would be unconstitutionally excessive may be reduced, but constitutional limits are best applied after a class has been certified. Then a judge may evaluate the defendant's overall conduct and control its total exposure. Reducing recoveries by forcing everyone to litigate independently—so that constitutional bounds are not tested, because the statute cannot be enforced by more than a handful of victims— has little to recommend it"). Stated differently, certification is not a death knell, as Toys will have an opportunity to challenge any subsequent award. Admittedly, certification greatly increases the settlement pressure Toys will face, but this alone does not provide a sufficient reason to decline certification. See *Bateman*, 623 F.3d at 722 ("We have held, however, that '[t]he fairness of the pressure[,] i.e., the sociological merits of the small claims class action[,] is not a question for us to decide,'" quoting *Blackie*, 524 F.2d at 899); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1275 (11th Cir.2004) ("Mere pressure to settle is not a sufficient reason for a court to avoid certifying an otherwise meritorious class action suit").

As the *Bateman* court noted, courts "must assume that Congress intended FACTA's remedial scheme to operate as it was written." *Bateman*, 623 F.3d at 722–23. Congress did not cap aggregate liability, nor did it enact an exception for potentially ruinous liability. Therefore, the court concludes that the enormity of any potential statutory damages award does not defeat the superiority requirement of Rule 23(b)(3).

### 2. "Grossly Excessive" Damages

Toys next argues that certification here will lead to an unconstitutional, "grossly excessive" punishment.[36] In *State Farm Mu-*

---

**35.** The case involved the failure to suppress credit card expiration dates on the receipts, and the court noted Congress's passage of the Clarification Act in 2009 to limit "abusive lawsuits" that involved only printing of the expiration date. *Id.* at 583. The court also concluded that to deter-

mine membership in the class, individualized inquiries would be necessary, *id.* at 585, and that the class members were not otherwise ascertainable, *id.* at 586.

**36.** *Id.* at 3–4.

*tual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, (2003), the Supreme Court concluded that "[t]he Due Process Clause prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor," and overturned a punitive damages award of $145 million, which was 145 times larger than the compensatory damages award of $1 million. *Id.* at 416, 123 S.Ct. 1513. Similarly, in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court determined that a $2 million punitive damages award was "grossly excessive" because defendant's conduct was "not sufficiently reprehensible" to warrant such a large exemplary award. *Id.* at 580, 116 S.Ct. 1589. Toys argues that these cases support its argument that certification here will impose an unconstitutional threat of excessive liability.

■ *State Farm* and *Gore* both involved grossly excessive punitive damages, not excessive compensatory damages awards. The decisions limit excessive or arbitrary *punishment;* they do not impose a limit on overall compensatory damages. See *State Farm*, 538 U.S. at 416, 123 S.Ct. 1513 (the constitution "prohibits the imposition of grossly excessive or arbitrary *punishments* " (emphasis added)); *Gore*, 517 U.S. at 600, 116 S.Ct. 1589 ("[T]he measure of civil *punishment* poses a question of constitutional dimension to be answered by this Court" (emphasis added)). As noted by the *Bateman* court, FACTA's statutory damages are intended to compensate victims for the "small or difficult to prove" harm they incur when a defendant violates the statute. *Bateman*, 623 F.3d at 718 (noting that the availability of "punitive

damages in addition to any actual or statutory damages … suggests that the statutory damages provision has a compensatory, *not punitive*, purpose" (emphasis added)); see also *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1312 (11th Cir.2009) (concluding that, because FACTA provides separately for punitive damages, the statutory damages provision is not punitive). Thus, the holdings in *State Farm* and *Gore* are not directly apposite.[37]

More importantly, even if a possible award against Toys will ultimately be unconstitutionally excessive, the certification stage is not the correct point in the proceedings to draw such a conclusion. The Ninth Circuit expressly held in *Bateman* that it is "not appropriate to evaluate the excessiveness of the award at [the class certification] stage of the litigation." *Bateman*, 623 F.3d at 723; see also *Murray*, 434 F.3d at 954 ("An award that would be unconstitutionally excessive may be reduced, but constitutional limits are best applied after a class has been certified" (internal citation omitted)). The *Bateman* court noted that "[b]ecause [it did] not know what amount of damages Bateman [would] seek nor how many individuals [would] ultimately claim the benefit of any damages awarded should plaintiffs prevail, any evaluation of AMC's potential liability at this time [was] unduly speculative." *Bateman*, 623 F.3d at 723; see also *Harris*, 564 F.3d at 1309 ("Typically, excessiveness review occurs after a jury has delivered a damages award," citing *State Farm*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585); *Pirian v. In–N–Out Burgers*, No. SACV06–1251 DOC (MLGx), 2007 WL 1040864, *5 (C.D.Cal. Apr. 5, 2007) ("As other courts have recognized, concerns

**37.** At the hearing, Toys argued that the Second Circuit's decision in *Parker v. Time Warner Entertainment Co., L.P.*, 331 F.3d 13 (2d Cir.2003), supports the proposition that statutory damages can, under certain circumstances, be considered punitive in nature. The *Parker* court held that when statutory damages are "so far beyond the actual damages suffered," they "come to resemble punitive damages." *Id.* at 22. This statement was dicta, as the court ultimately "decline[d] to consider what limits the due process clause may impose." *Id.* Moreover, the court stated:

"It may be that the aggregation in a class action of large numbers of statutory damages

claims potentially distorts the purpose of both statutory damages and class actions. If so, such a distortion could create a potentially enormous aggregate recovery for plaintiffs, and thus an *in terrorem* effect on defendants, which may induce unfair settlements. And it may be that in a sufficiently serious case the due process clause might be invoked, *not to prevent certification, but to nullify that effect and reduce the aggregate damage award." Id.* (emphasis added).

As a consequence, *Parker* does not support Toys' argument that the constitutional limits set forth in *State Farm* and *Gore* require that a class not be certified here.

regarding excessive damages are best addressed if the class is certified and damages are assessed.... If Plaintiff is able to prove that INO willfully violated Section 1681c(g)(1) on a large scale, entitling Plaintiff and the class to statutory damages, the Court will reduce any unconstitutionally excessive damages award at that time").

■ Toys contends that even the minimum damages award it faces, $2.9 billion, is grossly excessive, and thus there is no reason to wait until the exact damages award is known.[38] This argument overlooks the possibility that Toys may not be liable for damages at all. If the trier of fact determines that Toys did not act willfully, it will face no liability, and both the parties and the court will have benefitted from the efficient class-wide resolution of the issue. Furthermore, the *Bateman* decision appears to leave no room for debate; the Ninth Circuit expressly stated that the constitutionality of a possibly excessive award cannot be evaluated at the class certification stage. *Bateman*, 623 F.3d at 723. Given this, now is not the appropriate time to consider the constitutionality of any prospective damages award against Toys.[39]

### 3. Remaining Superiority Factors

Having concluded that neither the proportionality of potential damages to actual harm nor the absolute size of a potential award defeats superiority, the court turns to the superiority factors delineated in Rule 23(b)(3). "Under Rule 23(b)(3), the court must evaluate whether a class action is superior by examining four factors: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 992 (C.D.Cal.2006) (quoting *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 469 (N.D.Cal.2004)).

Plaintiffs argue that these factors weigh in favor of a finding of superiority, as class members will have little interest in pursuing individual claims due to the small potential recovery, and class-wide resolution will save time and resources. In *Murray*, 434 F.3d at 953, the court reviewed whether a class action was superior for resolving comparable claims under the Fair Credit Reporting Act. It concluded that "Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate." See also *Zinser*, 253 F.3d at 1190 ("Where damages suffered by each pu-

---

38. Toys Supp. at 10.

39. Toys also argues that certifying a class in the face of such potentially enormous award is contrary to the congressional intent behind FACTA. (Toys Opp. at 8–9.) The *Bateman* court thoroughly reviewed Congress's intent in enacting FACTA and concluded that Congress did not intend to place a ceiling on liability. *Bateman*, 623 F.3d at 722–23 ("In the absence of such affirmative steps to limit liability, we must assume that Congress intended FACTA's remedial scheme to operate as it was written. To limit class availability merely on the basis of 'enormous' potential liability that Congress explicitly provided for would *subvert* congressional intent" (emphasis added)). Toys' argument is therefore unavailing.

At the hearing, Toys asserted that certification would not carry out the statutory purpose of FACTA because no putative class member suffered actual harm. It cited the "Purpose" subsection of the Clarification Act, which states: "The purpose of this [Clarification] Act ... is to ensure that consumers suffering from any actual harm to their credit or identity are protected while simultaneously limiting abusive lawsuits that do not protect consumers but only result in increased cost to business and potentially increased prices to consumers." 15 U.S.C. § 1681n. The Clarification Act addressed the definition of "willful noncompliance"; it did not address the purpose of FACTA generally or whether actual harm must be alleged to certify a class seeking damages of the magnitude sought by the *Edwards* and *Ellis* classes here. As noted, the purpose of FACTA is "to prevent criminals from obtaining access to consumers' private financial and credit information in order to reduce identity theft and credit card fraud." Pub.L. No. 110–241, § 2, 122 Stat. 1565. The *Bateman* court concluded that declining to certify a class due to the enormity of the potential damages award did not serve this purpose. As a consequence, the court finds Toys' statutory purpose argument unavailing.

tative class member are not large, this factor weighs in favor of certifying a class action"). Similarly, in *Tchoboian v. Parking Concepts, Inc.*, No. SACV 09–422 JVS (ANx), 2009 WL 2169883, *7–8 (C.D.Cal. July 16, 2009), the court concluded that a class action was a superior vehicle for resolving FACTA claims. It noted that "there is no indication that the class members would have a strong interest in individual litigation," and that "concentrating the litigation in this forum will serve the interests of judicial economy." *Id.* at *8.

Toys asserts that individual actions are superior because FACTA permits the recovery of punitive damages and attorneys' fees, and thus "any person who has truly suffered an injury because of [its] actions … will have more than enough incentive and ability to enforce their rights."[40] It cites *Price v. Lucky Strike Entertainment, Inc.*, No. 07–960–ODW (MANx), 2007 WL 4812281, *6 (C.D.Cal. Aug. 31, 2007), in support of this argument. There, the court stated that "individual [FACTA] actions for punitive damages, in conjunction with actions for compensatory damages, would adequately compensate injured plaintiffs while imposing sufficient liability on [d]efendants to create general deterrence." See also *Vasquez–Torres v. McGrath's Publick Fish House, Inc.*, No. CV 07–1332 AHM (CWx), 2007 WL 4812289, *7 (C.D.Cal. Oct. 12, 2007) ("Simply because some individuals may not seek to pursue their statutory remedy does not make a class action superior in light of the litigant-friendly apparatus creates by Congress for challenging FACTA violations"). Both *Price* and *Vasquez–Torres*, however, pre-date the Ninth Circuit's holding in *Bateman.* Moreover, neither case relied exclusively on the language quoted by Toys; rather, each court found that class resolution was not superior primarily because of the potential enormity of the statutory damages award—the express reasoning rejected by the court in *Bateman.* See *Price*, 2007 WL 4812281, at *5 ("The Court believes putting a company out of business for failing to excise the expiration dates from credit card receipts—especially without proof of actual harm, is the type of

undesirable result that the Advisory Committee and the Ninth Circuit warned against"); *Vasquez–Torres*, 2007 WL 4812289, at *7 ("[C]lass treatment is inappropriate because the potential damages are wildly disproportionate to the harm and would ruin McGrath"). Thus, Toys' reliance on these cases is unavailing.

■ Ultimately, the court concludes that under the circumstances of this case, a class action is superior to individual suits. If the court declines to certify the classes, individual actions are not likely to be pursued on a broad scale because "the low amount of statutory damages available means no big punitive damages award on the horizon, thus making an individual action unattractive from a plaintiff's perspective." *Stillmock v. Weis Markets, Inc.*, 385 Fed.Appx. 267, 274 (4th Cir. July 1, 2010) (Unpub. Disp.); see also *Amchem Products*, 521 U.S. at 617, 117 S.Ct. 2231 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights"); *Hanlon v. Palace Entertainment Holdings, LLC*, No. 11–987, 2012 WL 27461, *5 (W.D.Pa. Jan. 3, 2012) ("[T]his [FACTA] case represents an action in which the potential damages obtainable by an individual—as low as $100 by statute and capped at $1,000—are likely too low to incentivize suit"). Moreover, the fact that attorneys' fees may be awarded does not demonstrate that class-wide resolution is not the superior approach. See *Tchoboian*, 2009 WL 2169883, at *9 ("The Court is not convinced that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages of up to $1,000 will result in enforcement of the FCRA by individual actions of a scale comparable to the potential enforcement by way of class action"). For all these reasons, a class action is a superior vehicle for achieving the compensatory and deterrent purposes of FACTA.

Turning to the remaining factors, other than the two cases that are part of this MDL proceeding, the court is unaware of any other

---

40. Ellis Opp. at 18.

action involving similar claims against Toys. Given that the allegations in *Edwards* concern violations at Toys stores in California, and that Edwards received his non-compliant receipt from a Toys store in this district, the Central District is an appropriate forum for resolution of the dispute.[41] Finally, any difficulties that this court or the Northern District of Illinois may encounter managing the proceedings are outweighed by the common issues that predominate, and the preservation of time and resources that class-wide resolution will yield. See *Johnson v. General Mills, Inc.*, 275 F.R.D. 282, 289–90 (C.D.Cal.2011) ("Additionally, the likely difficulties of managing this suit on a classwide basis are manageable and should be undertaken in light of the significant common issues that exist and predominate over individual issues"); see also *Kamm v. California City Development Co.*, 509 F.2d 205, 211 (9th Cir.1975) ("Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated"). Therefore, the court finds that the superiority requirement is satisfied.

### D. Whether the Rule 23(a) Factors are Satisfied

#### 1. Ascertainability

■ As noted, although not specifically enumerated in Rule 23, a class must be ascertainable before it can be certified. A class is sufficiently defined and ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member." *O'Connor*, 184 F.R.D. at 319; accord *Davoll v. Webb*, 160 F.R.D. 142, 143 (D.Colo.1995); see also *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 347 (S.D.Ga. 1996) ("[T]he 'description of the class must

be sufficiently definite to enable the court to determine if a particular individual is a member of the proposed class,'" quoting *Pottinger v. Miami*, 720 F.Supp. 955, 957 (S.D.Fla. 1989)).

None of the parties address ascertainability fully in his or its brief. Ellis asserts only that "this class is appropriate because the class members can be ascertained by reference to objective criteria."[42] Edwards omits any discussion of ascertainability, but proffers excerpts from a joint stipulation regarding Toys' earlier motion for protective order.[43] Toys previously sought a protective order to preclude Edwards from deposing a witness who could testify regarding its ability to identify class members. It stated: "In the meet and confer session held on January 4, 2010, and in prior meetings of counsel in July and December, 2009, [Toys'] counsel advised that it will have an ability to notify a class if one is certified."[44] Based on this representation, it appears that Toys can identify consumers who used a credit card at a Toys location during the relevant period. Toys does not dispute this fact, nor does it argue that the class cannot be ascertained through reference to objective criteria.

Other courts addressing motions to certify FACTA classes have generally found that such classes are ascertainable. See, e.g., *Tchoboian*, 2009 WL 2169883, at *5 (finding that a FACTA class was ascertainable because "the class members in the present action were either provided a receipt or they were not"); *Kesler v. Ikea U.S. Inc.*, No. SACV 07–568 JVS (RNBx), 2008 WL 413268, *3 (C.D.Cal. Feb. 4, 2008) ("Class membership ... [in a FACTA class] is 'objectively' ascertainable"); see also *Friedman–Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 154–55 (S.D.N.Y.2010) ("First, member-

41. The *Ellis* action, which seeks certification of a nationwide class, was transferred to this district for the purposes of pretrial proceedings only. (Certified Copy of Transfer Order from Judicial Panel on Multidistrict Litigation, Docket No. 1 (Oct. 9, 2008).) Once pretrial proceedings are complete, the case will be returned to the Northern District of Illinois for trial. Neither party has addressed the propriety of the Northern District of Illinois as a forum for a nationwide class. Ellis, however, received a noncompliant receipt at a Toys location in Illinois, such that Illinois

appears to be an appropriate forum for resolving the *Ellis* class claims.

42. Ellis Motion at 13.

43. Declaration of J. Mark Moore ("Moore Decl."), Docket No. 47 (Mar. 8, 2010), ¶ 9, Exh. E.

44. *Id.* at 20.

ship in the class is defined by identifiable criteria—all debit or credit card customers who received a receipt from Lindt Store # 347 whose receipt was printed after December 4, 2006 and contained more than the last five digits of their credit card number, or whose receipt was printed after June 3, 2008 and contained the expiration date of the card. The contours of this class are clearly set forth and class membership can easily be determined by these criteria. Second, the Court views the small number of individualized factual determinations that must be made here in ascertaining membership in the class ... entirely manageable. Therefore, the Court finds that the proposed class is sufficiently ascertainable"); *Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139, 146–47 (N.D.Ill.2010) ("The required analysis—determining only whether the purported class member made a purchase from Bacci within the set dates—is a straightforward one. Although Defendant's own records are not as complete as Defendant itself insists they should be, there is a log listing the receipts issued during the period in which Bacci was not in compliance with FACTA's truncation requirement. The log includes partial credit card information for each transaction, the date it occurred, and the amount of the transaction. This information can, as Plaintiff explains, be used to verify whether any individual who responds to class notice is in fact a member of the class. The court concludes the class is sufficiently definite and overrules Defendant's objection on this basis").[45]

■ Ultimately, the court finds that members of both the *Edwards* and *Ellis* classes can be identified by reference to objective criteria: whether the class members received a receipt, whether the receipt contained more than the permissible number of credit card digits, and whether the class member was purchasing as a consumer. Each of these criteria is "sufficiently definite" for the court feasibly to determine whether or not the individual is a class member. The fact that Toys has represented it can program its computer system to identify class members for purposes of notification bolsters the court's conclusion that class members can be readily ascertained.

## 2. Numerosity

■ Under the Federal Rules of Civil Procedure, before a class can be certified, the court must determine that it is "so numerous that joinder of all members is impracticable." See FED.R.CIV.PROC. 23(a)(1). "Impracticability does not mean impossibility, [however,] ... only ... difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir.1964) (internal quotations omitted). There is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must examine the specific facts of each case to evaluate whether the requirement has been satisfied. See *General Tel. Co. v. EEOC*, 446 U.S. 318, 329–30, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). "As a general rule, [however,] classes of 20 are too small, classes of 20–40 may or may not be big enough depending on

---

45. *Rowden*, 282 F.R.D. 581, is an exception to this general trend. There, the court determined that, because FACTA applies only to consumer transactions, "every single class member will have to testify to prove his or her consumer status," and "[s]uch individual, fact-specific inquires would be a daunting task here." *Id.* at 585. As a result, it determined that the class was not ascertainable. *Id.* Other courts addressing the issue of individualized inquiries concerning the consumer status of putative class members have addressed the question in examining Rule 23(b)'s predominance requirement. See, e.g., *Najarian*, 2007 WL 4682071, at *3 ("Defendants [ ] argue that individualized issues predominate here because each class member must prove that ... he or she was acting as a 'consumer' "); *Vasquez–Torres*, 2007 WL 4812289, at *5

("McGrath argues that individualized issues predominate because each putative class member must individually prove that he or she was ... acting as a 'consumer'—i.e., using a personal credit or debit card and not using a corporate or business card"). At least one other court in this district that has considered whether an inquiry concerning the consumer status of class members rendered a class unascertainable, moreover, has disagreed with *Rowden*. In *Kesler*, 2008 WL 413268, at *3, the court concluded that "the question whether or not a particular credit card user is a 'consumer' within the meaning of the statute is an issue of objective fact that does not render the class unascertainable." Based on its survey of comparable authority, the court declines to follow *Rowden* on this point.

the circumstances of each case, and classes of 40 or more are numerous enough." *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D.Cal.1988) (citing 3B J. Moore & J. Kennedy, MOORE'S FEDERAL PRACTICE ¶ 23–05[1] (2d ed. 1987)).

Toys has determined that it printed more than 29 million noncompliant receipts for consumers nationwide. *Edwards*, 527 F.Supp.2d at 1204–05. This easily satisfies the numerosity requirement for the nationwide class. In California alone, Toys printed 2,074,428 noncompliant receipts.[46] This satisfies the numerosity requirement for the California class. Toys does not dispute that the numerosity requirement is satisfied for both the *Edwards* and *Ellis* classes. Consequently, the court finds that the *Edwards* and *Ellis* plaintiffs have satisfied Rule 23(a)'s numerosity requirement.

### 3. Commonality

Commonality requires "questions of law or fact common to the class." See FED.R.CIV.PROC. 23(a)(2). The commonality requirement is construed liberally, and the existence of some common legal and factual issues is sufficient. *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1320 (9th Cir.1982); accord *Hanlon*, 150 F.3d at 1019 ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively"); see also, e.g., *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y.1989) ("Unlike the 'predominance' requirement of Rule 23(b)(3), Rule 23(a)(2) requires only that the class movant show that a common question of law or fact exists; the movant need not show, at this stage, that the common question overwhelms the individual questions of law or fact which may be present within the class"). As the Ninth Circuit has noted: "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019.

That said, the putative class's "claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. Although for purposes of Rule 23(a)(2) even a single common question will do, *id.* at 2556, " '[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.' " *Id.* at 2551 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.REV. 97, 132 (2009)). As the Ninth Circuit recently articulated by way of example, "it is insufficient to merely allege any common question, for example, 'Were Plaintiffs passed over for promotion?' Instead, they must pose a question that 'will produce a common answer to the crucial question why was I disfavored.' " *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir.2011) (quoting *Dukes*, 131 S.Ct. at 2552).

Ellis, Edwards and Schley identify several questions common to the classes they seek to represent that are central to resolution of the litigation. Two of these are whether Toys had a practice of violating FACTA during the period in question, and whether Toys acted "willfully" when it gave consumers noncompliant receipts.[47] Toys does not dispute that there is a common question, and other courts have recognized that the common issues identified by plaintiffs are sufficient to satisfy Rule 23(a)'s commonality requirement. See e.g. *Tchoboian*, 2009 WL 2169883, at *5 ("In this case, there is a common core of salient facts across the class. Each member of the proposed class

---

**46.** Moore Decl., Exh. D at 4.

**47.** Edwards Motion at 7; Ellis Motion at 14.

allegedly received a non-compliant receipt from PCI after the FACTA compliance deadline. In addition, there are substantial shared legal issues. The overriding legal issue is whether PCI's alleged non-compliance was willful so that the class members are entitled to statutory damages. Moreover, whether PCI violated FACTA is a combined question of law and fact common to all members"); *Kesler*, 2008 WL 413268, at \*3 ("In this case, the facts and legal issues of each class member's claim are nearly, if not entirely, identical. There is a common core of salient facts across the class. Each member of the proposed class received a non-compliant receipt from IKEA after the December 4, 2006 FACTA compliance deadline. The overriding legal issue is whether IKEA's non-compliance was willful, so that the class members are entitled to statutory damages.... The court therefore finds that the proposed class members share sufficient commonality to satisfy Rule 23(a)(2)"). See also *Reynoso v. South County Concepts,* No. SACV07–373 JVS (RCx), 2007 WL 4592119, \*2 (C.D.Cal. Oct. 15, 2007) (finding commonality in a FACTA case); *Medrano v. WCG Holdings, Inc.,* No. SACV 07–0506 JVS (RNBx), 2007 WL 4592113, \*2 (C.D.Cal. Oct. 15, 2007) (same). Consequently, the court finds that the commonality requirement of Rule 23(a) is satisfied with respect to the classes that Edwards, Schley and Ellis seek to certify.

### 4. Typicality

■ Typicality requires a determination as to whether the named plaintiff's claims are typical of those of the class members he seeks to represent. See FED.R.CIV.PROC. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon,* 150 F.3d at 1020; see also *Schwartz v. Harp,* 108 F.R.D. 279, 282 (C.D.Cal.1985) ("A plaintiff's claim meets this requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory").

■ "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon,* 976 F.2d at 508 (citation and internal quotations omitted). Typicality, like commonality, is a "permissive standard[ ]." *Hanlon,* 150 F.3d at 1020. Indeed, in practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon,* 457 U.S. at 157–58 n. 13, 102 S.Ct. 2364. See also *Dukes,* 131 S.Ct. at 2551 n. 5 ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest,'" citing *Falcon,* 457 U.S. at 158 n. 13, 102 S.Ct. 2364).

■ Typicality may be found lacking "if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Hanon,* 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990)); see also *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.,* 628 F.2d 994, 999 (7th Cir.1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation"). To be typical, a class member need not prove that he is immune from any possible defense, or that his claim will fail only if every other class member's claim also fails. Instead, he must establish that he is not subject to a defense that is not "typical of the defenses which may be raised against other members of the pro-

posed class." *Id.;* see also *Ellis,* 657 F.3d at 984.

Edwards, Schley, and Ellis assert that typicality is satisfied. Ellis argues that "typicality is inherent in the class definition," as "[e]ach of the class members, including Plaintiff, [was] subjected to the same illegal conduct." [48] Similarly, Edwards and Schley contend that "[l]ike each class member, Plaintiffs allege that Defendant willfully violated FACTA by providing them with illegal receipts containing 10 account digits, and Plaintiffs seek statutory damages pursuant to Section 1681n." [49] The fact that both sets of plaintiffs plead a claim based on provision of a noncompliant receipt, and that each seeks statutory rather than actual damages, is sufficient to establish typicality. See *Kesler,* 2008 WL 413268, at *4 ("Here, Kesler's claim is, in fact, 'substantially identical' to the claims of the proposed class members— namely, she alleges that IKEA issued her a receipt in willful violation of the FACTA," quoting *Hanlon,* 150 F.3d at 1020). See also *Tchoboian,* 2009 WL 2169883, at *6 (finding that a FACTA class representative's claim was "substantially identical" to the claims of the putative class members); *Reynoso,* 2007 WL 4592119, at *3 (same); *Medrano,* 2007 WL 4592113, at *3 (same). There is no evidence suggesting that Ellis's or Edwards' and Schley's claims differ in any way from the claims of absent class members. Moreover, Toys does not contend that either Ellis or Edwards and Schley present atypical claims. The court therefore finds that Rule 23(a)'s typicality requirement is satisfied with respect to the classes that Ellis and Edwards and Schley seek to certify.

### 5. Adequacy of Representation

The adequacy of representation requirement set forth in Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiff[ ] and [his] counsel have any conflicts of interest with other class members and (2) will the named plaintiff[ ] and [his] counsel prosecute the action vigorously on behalf of the class?" *Hanlon,* 150 F.3d at 1020; accord *Staton v. Boeing Co.,* 327 F.3d

938, 957 (9th Cir.2003). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis,* 657 F.3d at 985. Individuals are not adequate representatives of a class when "it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs." *Helfand v. Cenco, Inc.,* 80 F.R.D. 1, 7 (N.D.Ill.1977). "Several district courts thus have properly denied class certification where the class representatives had so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 727 (11th Cir.1987); *Kelley v. Mid–America Racing Stables, Inc.,* 139 F.R.D. 405, 409–10 (W.D.Okla.1990). While credibility is a "relevant consideration with respect to the adequacy analysis," to show that a class representative is not adequate, credibility problems must relate to " 'issues directly relevant to the litigation or there are confirmed examples of dishonesty, such as a criminal conviction for fraud.' " *Harris v. Vector Marketing Corp.,* 753 F.Supp.2d 996, 1015 (N.D.Cal.2010) (quoting *Ross v. RBS Citizens, N.A.,* No. 09 CV 5695, 2010 WL 3980113, *4 (N.D.Ill. Oct. 8, 2010)); see also *Del Campo v. American Corrective Counseling Servs., Inc.,* No. C 01–21151 JW (PVT), 2008 WL 2038047, *4 (N.D.Cal. May 12, 2008) (stating that " '[g]enerally, unsavory character or credibility problems will not justify a finding of inadequacy unless related to the issues in the litigation,' " quoting *Byes v. Telecheck Recovery Services, Inc.,* 173 F.R.D. 421, 427 (E.D.La.1997)).

Toys contends that neither Ellis nor Edwards and Schley have established that they are adequate class representatives. Specifically, Toys argues that Edwards, Schley and Ellis have failed to submit declarations stating that they will represent the interests of the class; as a consequence, it asserts, there is a real risk they will put their own interests ahead of those of absent class

---

**48.** Ellis Motion at 15.

**49.** Edwards Motion at 8.

members.[50] Plaintiffs, conversely, argue that no conflict exists because all class members have identical claims and seek statutory damages.[51]

### a. Declarations of the Class Representatives

Toys asserts that none of the class representatives has established that he has no conflict of interest with the class, as none has "submitted a declaration even giving lip service to the requirement [that there is no conflict of interest], much less providing facts to establish it."[52] Toys cites *Vasquez–Torres*, 2007 WL 4812289, at *4, as authority for the proposition that a class representative must submit a declaration or other evidence establishing that he or she will be an adequate representative. In *Vasquez–Torres*, the court stated:

> "Plaintiff[']s declaration states only that she received a receipt at a McGrath restaurant in Arcadia.... Although Plaintiff[']s motion recites that there is no conflict of interest, Plaintiff has proffered no evidence regarding the proposed representative of the class that would allow the

Court to assess whether her interests are aligned with those of the proposed classes. Simply reciting the language of the rule, as Plaintiff has done, is not necessarily sufficient." *Id.*

The *Vasquez–Torres* court did not, however, conclusively determine that plaintiff had failed to establish adequacy of representation; it simply held that since "this action may not be certified as a class action anyway (for the reasons set forth below), the Court will refrain from finding that Plaintiff has failed to satisfy Rule 23(a)(4)." *Id.* The case, therefore, is not authority for the proposition that a named plaintiff must submit a declaration before a court can find that he is an adequate class representative.

Moreover, all of Edwards, Schley and Ellis submitted declarations with their replies asserting that they will continue vigorously to pursue claims on behalf of the class.[53] Ellis states that he has frequently communicated with his counsel regarding the case, that he has participated in discovery, and that he understands his "role here is to protect the interests of the class members, not simply to attempt to advance my potential financial interests and/or those of my attorneys."[54]

---

50. Edwards Opp. at 22–23; Ellis Opp. at 23–24. Toys makes no argument that counsel for Ellis or counsel for Edwards and Schley cannot adequately represent the interests of the respective classes. See *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir.2010) ("Whether the class representatives satisfy the adequacy requirement depends[, *inter alia*,] on the qualifications of counsel for the representatives ...," quoting *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir.1998) (internal quotation marks omitted)). Indeed, Toys acknowledges that Edwards' and Schley's counsel is competent and skilled in class action litigation. (See Edwards Opp. at 24.) Although it asserts that counsel is abusing FACTA (see *id.* at 24–25), this argument appears to be based in large part on the nature of the remedies FACTA provides (e.g., statutory damages with no requirement of actual harm) and on the fact that FACTA class actions can produce significant damages awards. The fact that counsel have filed and litigated multiple FACTA class actions cannot be denominated "abuse" of the statutory scheme Congress intentionally created or of the class action procedural mechanism.

51. Edwards Motion at 8; Ellis Motion at 16.

52. Edwards Opp. at 22; Ellis Opp. at 23.

53. In general, "[i]t is improper for the moving party to 'shift gears' and introduce new facts or

different legal arguments in the reply brief than [those that were] presented in the moving papers." William W. Schwarzer, A. Wallace Tashima, and James M. Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 12:107 (The Rutter Group 2005). For this reason, the court may, in its discretion, decline to consider new facts or arguments raised in reply. See, e.g., *Spreadbury v. Bitterroot Public Library*, 856 F.Supp.2d 1195, 1202 (D.Mont.2012) ("A court should not decide new arguments raised in a reply brief or first raised in objections").

Here, however, the reply declarations concern issues addressed in the moving papers, and respond directly to arguments presented in Toys' opposition. See *Burnham v. City of Rohnert Park*, No. C 92–1439, 1992 WL 672965, *5 (N.D.Cal. May 18, 1992) ("[R]eply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion"); *Scott v. R.J. Reynolds Tobacco Co.*, No. Civ.A. 99–3091, 2001 WL 797992, *5 (E.D.La. July 12, 2001) (same). As a result, the court will consider the declarations in deciding whether Edwards and Ellis are adequate class representatives.

54. Declaration of Gregory J. Ellis ("Ellis Decl."), Docket No. 68 (Apr. 27, 2010), ¶ 5.

Similarly, Edwards and Schley have each submitted a declaration stating that they have been extensively involved in the proceedings to this point, that they understand their role as class representatives, and that they will continue to participate in the litigation on behalf of absent class members.[55] Given this, Toys' contention that Ellis, Edwards and Schley have failed to adduce evidence that they will be adequate representatives is unavailing.

### b. Representatives' Relationship With Counsel

Toys next asserts that both Ellis and Edwards and Schley have pre-existing relationships with class counsel that "raise a very real concern that Plaintiffs have a conflict of interest with potential class members."[56] As respects Ellis, Toys asserts that he and his counsel, Brian Wanca, "have had a personal relationship for 'many years' going back to the early nineties."[57] Toys also notes that Ellis and Wanca had a prior professional relationship, as Wanca, general counsel for a company, previously hired Ellis to serve as outside counsel.[58] Toys asserts that, based on these circumstances, "[i]t would not be unreasonable to infer that Mr. Ellis is motivated not by a desire to protect consumers, but rather to secure a $29 billion windfall and compensation for his counsel."[59]

Toys cites *Serna v. Big A Drug Stores, Inc.*, No. SACV 07-0276 CJC (MLGx), 2007 WL 7665762 (C.D.Cal. Oct. 9, 2007), for the proposition that a pre-existing business relationship between a class representative and class counsel may give rise to a conflict of interest. In *Serna*, the class representative had been an employee of class counsel for more than thirty years, and reported directly to the named partners in the firm. *Id.* at *2. The court determined that this relationship, coupled with the fact that "attorneys' fees far exceed the statutory award that Ms. Serna may receive," demonstrated that "Ms. Serna stands to gain little from her dispute with Big A, but stands to gain much more from a substantial award of attorneys' fees to her employer of over 30 years.... Given this conflict of interest, Ms. Serna cannot serve as an adequate protector of the interests of absent class members." *Id.* The court noted additionally that Serna was suffering from an illness, which had caused her to "withdraw from an identical lawsuit against Costco filed at the same time as the instant action because of serious health concerns." *Id.* at 3. The court concluded that the fact that she was not seeking to withdraw from the case before it was evidence that "class counsel [was] driving th[e] class litigation, using Ms. Serna as a class representative only because no other litigant [could] be found." *Id.*

Here, the relationship between Ellis and Wanca is not nearly as close or substantial as the relationship at issue in *Serna*. Ellis testified at deposition that he had only a limited business relationship with Wanca in the past.[60] Moreover, Wanca and Ellis are no longer in the same line of work, as Wanca has changed specialties.[61] Finally, Ellis tes-

---

**55.** Edwards Decl., ¶¶ 5, 6 ("I have frequently communicated with my counsel in this case. I have reviewed and responded to discovery. I was deposed.... My role here is to protect the interests of the class members, not simply to attempt to advance my attorneys' potential financial interests, my potential right to seek an incentive award, or to assist Toys R Us in marketing. I will continue to participate in this case to the extent necessary to protect fairly and adequately my interests and those of other like me, including through trial and appeals, if needed"); Schley Decl., ¶¶ 5, 6 (same).

**56.** Edwards Opp. at 24; see also Ellis Opp. at 24 (Ellis' past relationship with his counsel shows "a conflict of interest").

**57.** Ellis Opp. at 24.

**58.** *Id.*

**59.** *Id.*

**60.** McCord/Ellis Decl., Exh. 2 ("Ellis Depo.") at 53:13–19 ("Q: Have you [and Wanca] ever shared clients or—or referred clients to each other? A: The only thing was when he was in franchising, he was a general counsel for a franchise company. And I, you know, had a case or had a couple matters for that particular—for that company. Sparks Tune-up was the name of it").

**61.** *Id.* at 44:21–45:2 ("Q: And how did you meet [Mr. Wanca]? A: Through a, you know, a franchise association meeting. Q: So does he do a lot of franchise work as well then? A: No, I don't believe so. He did 20 years ago").

tified that he approached Wanca to represent him in this case not because of any personal relationship, but because he knew Wanca had previously handled similar lawsuits.[62] Given that Wanca hired Ellis at most a couple of times and no longer practices in the same area of law, Ellis does not stand to receive the same type of employment benefits that the plaintiff in *Serna* did if Wanca earns a large fee for handling this matter. See *In re Google AdWords Litigation*, No. 5:08–CV–3369 EJD, 2012 WL 28068, *13 (N.D.Cal. Jan. 5, 2012) ("Defendant briefly argues that named Plaintiff Pulaski & Middleman has a professional relationship with plaintiff's counsel, Foote Meyers, which creates a financial entanglement that renders Pulaski & Middleman an inappropriate class representative. However, a close examination of Adam Pulaski's deposition testimony reveals that the nature of the relationship was purely professional, involving shared work on two cases, as well as a few referrals which did not involve referral fees. This relationship is quite different from the long-standing personal friendship and financial ties" that can render a representative inadequate). Given the nature of their relationship, the court cannot find that Ellis will favor the interests of Wanca over the interests of individual class members.

Moreover, as noted, Ellis has stated that he will continue to participate in the proceedings and will protect the interests of absent class members. See *Rosales v. El Rancho Farms*, No. 1:09–cv–00707–AWI–JLT, 2012 WL 3763955, *7 (E.D.Cal. Aug. 29, 2012) ("Plaintiffs have each provided declarations asserting they do not have conflicts of interest with putative class members. Further, 'Plaintiffs are pursuing damages for the same late meal period violation that each class member suffered,' and 'have cooperatively participated in the litigation, answering discovery and appearing for deposition.' Accordingly, Lorena Corza and Margarita Ro-

sales have demonstrated they are adequate representatives for the putative class members" (internal citations omitted)). Consequently, the court concludes that Ellis is an adequate class representative.

Toys makes similar arguments concerning Edwards' and Schley's relationship with class counsel in the *Edwards* case. It asserts that Schley is a "close personal friend[ ]" of his attorney, J. Mark Moore, and that Schley "recruited" Edwards to be a plaintiff for Moore.[63] Toys' argument is not persuasive. First, assuming Schley and Moore are close friends, this does not necessarily render Schley an inadequate representative. See *Kesler*, 2008 WL 413268, at *5 ("IKEA does not cite any authority that extends the rule [that certain relationships render class representatives inadequate] beyond familial and business relationships to mere friendships. When class representative and class counsel share a familial relationship or a business partnership, their individual interests are inherently closely aligned so that there is an undeniable potential for conflict of interest with the absent class members. However, under these facts, the Court finds that this friendship does not have the same potential"); compare *London v. Wal–Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir.2003) ("In summary, because the personal *and* financial ties between London and Ader are very close, and because Ader's recovery will vastly exceed what any of the class members will receive, we conclude that London cannot fairly and adequately represent the class" (emphasis original)).

Moreover, given the evidence in the record, Toys appears to overstate the relationship between Schley and Moore. The only evidence concerning the relationship between Schley and Moore is Schley's deposition testimony, in which he states that he purchased Moore a gift when Moore and his

---

**62.** *Id.* at 46:22–47:10 ("Q: Well, I'm just—I guess I'm just trying to understand what inspired you to talk to Mr. Wanca about this credit card receipt in particular. Did you know before that he did this kind of work? A: Yeah. I mean I know—Q: Before this receipt? A: I knew that he did this kind of work for—I don't know how long he had been doing it. But he mentioned it

in passing, you know, over the past couple months. I don't think he encouraged me to go look at all my receipts, if that's what—He definitely didn't do that").

**63.** Edwards Opp. at 23.

wife had a child.[64] This evidence is insufficient to demonstrate that Schley and Moore are so closely acquainted that Schley will place his attorney's interests ahead of the interests of absent class members. There is no assertion by Toys, nor is there evidence, that Schley and Moore have a professional relationship or that Schley stands to gain if Moore receives a substantial fee. Compare *Simon v. Ashworth, Inc.,* No. CV071324GHKAJWX, 2007 WL 4811932, *4 (C.D.Cal. Sept. 28, 2007) ("Plaintiff's family has a close relationship with counsel. Plaintiff's father has worked for counsel's law firm as a legal coordinator for at least two and a half years. Plaintiff has known counsel for his 'whole life' and visits the law offices about once a week for social visits. Plaintiff has even sporadically worked in the law offices moving storage boxes. As such, Plaintiff's interests appear to be more aligned with counsel than with the class members whom he purports to represent"). Additionally, as noted, Schley has asserted that he understands his role as class representative and will continue to participate in the litigation and protect the interests of absent class members. Given this, and given minimal evidence that Schley has a real conflict of interest, the court finds that Schley is an adequate class representative.

Finally, the court concludes that Edwards is also an adequate representative. Toys asserts that Schley recruited her as a plaintiff, and that she had "absolutely no idea" about the case when she decided to become a plaintiff.[65] Edwards concedes that she was approached by Schley to search her records for noncompliant receipts.[66] This alone, however, does not indicate that she will have a conflict of interest representing the class. First, the fact that Schley and Edwards have a pre-existing relationship does not demonstrate Edwards will place *Moore's* interest ahead of the class, as there is no alleged relationship between Edwards and Moore. Toys appears to contend that Schley and Moore have a close relationship, that Edwards and Schley have a relationship, and thus that Edwards and Moore are vicariously connected. Its authority, however, provides no support for this argument. Toys again cites *Serna* and *Simon,* but, as noted, the class representatives and class counsel in those cases were far more entangled, both personally and professionally, then Schley and Moore are here, and certainly more closely related than Edwards and Moore. Moreover, like both Ellis and Schley, Edwards has submitted a declaration stating that she has participated in discovery, that she will fulfill the duties of a class representative, and that she "has no past or present financial, employment, familial or other relationship with any of the attorneys representing [her] that would cause [her] to put their economic interests above those of the other Toys R Us customers I seek to represent." [67] See *York v. Starbucks Corp.,* No. CV 08–07919 GAF (PJWx), 2011 WL 8199987, *31 (C.D.Cal. Nov. 23, 2011) ("Plaintiff has provided a declaration stating that she has dedicated substantial time to this action, worked closely with her attorneys, and, as a class representative, will continue to work to the best of her abilities to prosecute the action on behalf of the class. Moreover, Plaintiff has also listed in her declaration the duties of a class representative, which shows that she understands her responsibilities" (internal citations omitted)). Toys' purported evidence of a conflict of interest does not overcome Edward's showing that she will adequately represent the interests of the class.

In conclusion, the court finds that Ellis, Schley, and Edwards are adequate class rep-

---

64. McCord/Edwards Decl., Exh. 2 ("Schley Depo.") at 23:25–24:6 ("Q: Is there anything standing out in your mind in terms of what you believe you purchased online? A: You can ask Mr. Moore what baby present I gave him. That might have been one of them. But, you know, seriously, I'd have to think about what babies we're dealing with here, and probably don't remember specifically").

65. Edwards Opp. at 23–24.

66. Moore Supp. Decl., Exh. A ("Edwards Depo."), at 34:19–24 ("Q: What do you remember about your conversation with Mr. Schley? A: Just what I told you. He asked me if I have any receipts laying around just to look through them to see if they have any more than five digits of the credit card number or the expiration date").

67. Edwards Supp. Decl., ¶¶ 4–6.

resentatives, and satisfy the adequacy requirement of Rule 23(a). It further finds that counsel for Ellis and counsel for Edwards and Schley are qualified to represent the interests of the respective classes.

### c. Conclusion Regarding Rule 23(a)

Based on the foregoing analysis, the court concludes that the plaintiffs have satisfied the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

### E. Whether Common Questions Predominate

 The predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Products*, 521 U.S. at 623–24, 117 S.Ct. 2231. If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied. *Hanlon*, 150 F.3d at 1022. " '[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.' " *Zinser*, 253 F.3d at 1190 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at 535–39 (1986)). This is because, *inter alia*, "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." *Id.*

Ellis and Edwards and Schley assert that common questions predominate because each class member's claim turns on whether Toys' wrongful conduct was willful.[68] Toys counters that, because FACTA applies only to "consumer" purchases, individual analysis of each of 29 million receipts will be required to determine whether the purchase was made with a corporate or personal credit card.[69] Toys asserts that the need for these individualized inquiries renders certification inappropriate.

Courts in this district have reached inconsistent conclusions when analyzing whether common questions predominate in FACTA class actions. In *Seig v. Yard House Rancho Cucamonga, LLC*, No. CV 07-2105 PA (MANx), 2007 WL 6894503 (C.D.Cal. Dec. 10, 2007), Judge Percy Anderson declined to certify a class of consumers who received noncompliant receipts from a Yard House restaurant. Judge Anderson found that "even if a willfulness question [was] central to th[e] case, it [did] not give rise to liability independent of individualized factual determinations as to which customers were 'consumers' and which obtained 'receipts' containing information that should have been excluded under FACTA." *Id.* at *4. He held that "because such individualized questions underl[ay] any determination of Defendant's liability, and liability [was] the main issue in th[e] case, the main issue require[d] separate adjudication of each class member's claim and certification [was] inappropriate." *Id.*

In *Najarian*, 2007 WL 4682071, Judge R. Gary Klausner denied a motion to certify a class of plaintiffs who received noncompliant receipts from Avis Rent A Car. While Judge Klausner "recognize[d] the prevalence of common issues in the present case," he concluded that "certification would necessarily entail individualized factual determinations for up to 1.66 million customers who might be members of the proposed class." *Id.* at *3. Because "[o]nly those customers who paid with 'consumer' credit or debit cards and received Rental Agreement Receipts ... qualif[ied] for relief under the statute," he found that the proposed class was not "sufficiently cohesive to warrant adjudication by representation." *Id.*

Similarly, in *Evans v. U–Haul Co. of California*, No. CV 07–2097–JFW (JCx), 2007 WL 7648595 (C.D.Cal. Aug. 14, 2007), Judge John F. Walter declined to certify a class of plaintiffs who received noncompliant receipts at various U–Haul locations in California. Judge Walter concluded that "individualized factual determinations as to which customers were 'consumers' and which obtained 're-

**68.** Edwards Motion at 9–10; Ellis Motion at 17.

**69.** Edwards Opp. at 21; Ellis Opp. at 22.

ceipts' containing information that should have been excluded under FACTA" rendered class certification inappropriate. *Id.* at *3.

Other courts in this district, however, have reached the opposite conclusion. In *Tchoboian,* 2009 WL 2169883, Judge James V. Selna certified a class of consumers who received noncompliant receipts from a parking facility in Hollywood, California. Judge Selna observed that "[c]lass members share the significant common questions of law as to whether PCI violated FACTA and whether such noncompliance was willful." *Id.* at *7. Although Judge Selna acknowledged that there might be some difficulty resolving individualized issues, e.g., whether each class member received a noncompliant receipt, "common questions nevertheless predominate[d]." *Id.*[70]

In *Vasquez–Torres,* 2007 WL 4812289, Judge A. Howard Matz found that common issues predominated in a case involving a nationwide class of consumers who received noncompliant receipts from defendant's restaurants. Judge Matz determined that the "only liability issue [was] whether Defendant's violation was willful," and this common question rendered the class sufficiently cohesive to warrant adjudication by representation. *Id.* at *5. He concluded that, to the extent individual inquiries concerning the consumer status of class members were necessary, "the question of whether any individual restaurant customer fulfill[ed] the requirements of § 1681n should be resolved after the class, if any, [was] certified." *Id.*

The vast majority of courts outside this district have similarly found that common questions predominate in FACTA class actions. See, e.g., *Stillmock v. Weis Markets, Inc.,* 385 Fed.Appx. 267, 273 (4th Cir. July 1, 2010) (Unpub. Disp.) ("[W]here, as here, the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat

class certification under Rule 23(b)(3)"); *Bush v. Calloway Consolidated Group River City, Inc.,* No. 3:10–cv–841–J–37MCR, 2012 WL 1016871, *10 (M.D.Fla. Mar. 26, 2012) ("Despite the heightened standard under Rule 23(b)(3), it is clear that [t]he core legal and factual issues in this action do not require individualized determination, but can be resolved through generalized proof applicable to the class. For example, the resolution of whether Calloway's noncompliance with FACTA was 'willful' applies to all class members' claims. Additionally, Bush seeks only statutory damages, likely obviating the need for individualized damages determinations" (internal citations omitted)); *Hanlon v. Palace Entertainment Holdings, LLC,* No. 11–987, 2012 WL 27461, *4 (W.D.Pa. Jan. 3, 2012) ("Again, the factual scenario underlying the class's [FACTA] claims are identical in nearly all relevant respects. The court finds that common questions of law or fact 'predominate over any questions involving individual class members' "); *Shurland v. Bacci Cafe & Pizzeria on Ogden Inc.,* 259 F.R.D. 151, 159 (N.D.Ill.2009) ("The conduct at issue, Defendant's creation of computer-generated credit card receipts, is uniform across the class. The question of whether that conduct was willful (and consequently whether Defendant is liable) similarly predominates over other individual issues and, indeed, will likely prove the principal common question in this case, given that Defendant concedes that it violated the Act's truncation requirements" (internal citation omitted)); *Engel v. Scully & Scully, Inc.,* 279 F.R.D. 117, 129 (S.D.N.Y.2011) ("The core legal and factual issues in this action do not require individualized determination, but can be resolved through generalized proof applicable to the class. As described above, the parties dispute what the defendant's business practice was when printing receipts. The resolution of this issue applies to all class members' claims"); *Armes v. Sogro,* Inc., No. 08–C–0244, 2011 WL 1197537, *5 (E.D.Wis. Mar. 29, 2011) (stating that "Sogro's argument that predominance is not met because each cardholder

---

**70.** Judge Selna addressed predominance in several other FACTA class action cases and determined that common questions predominated in

each action. See *Reynoso,* 2007 WL 4592119, at *7; *Medrano,* 2007 WL 4592113, at *4; *Kesler,* 2008 WL 413268, at *7.

must be asked whether the transaction was for a personal or business purpose or whether the card was an individual or corporate card is rejected," and concluding that "common issues of fact and law predominate over issues affecting individual members").

■ The weight of authority favors a finding here that common questions predominate. Common issues concerning Toys' noncompliance with FACTA and whether that noncompliance was willful predominate over individualized inquiries concerning the consumer status of each class member. This is particularly true given the nature of Toys' business. While it is plausible that some businesses bought items at Toys stores during the relevant period (e.g., arts and crafts products or electronics), in all likelihood, the vast majority of purchases were personal (e.g., toys or children's clothing). Mechanisms can be devised to address this issue if there is a liability finding in favor of either class.

A finding of predominance is also supported by the fact that no class member seeks actual damages. Courts have been more willing to find predominance where, as here, the class seeks only statutory damages. See, e.g., *Engel*, 279 F.R.D. at 129 (finding predominance "[b]ecause the [FACTA] complaint seeks statutory damages," and thus "there will be no need for individualized damages determinations").

Furthermore, in at least some of the cases in which predominance was found lacking, the courts emphasized that not only would it be required to analyze whether individual class members were consumers, but also whether customers who paid with a credit card in fact received a receipt. See *Najarian*, 2007 WL 4682071, at *3 (agreeing with defendant's argument that "individualized issues predominate here because each class member must prove that 1) he or she obtained a 'receipt' under the meaning of the statute and 2) that he or she was acting as a 'consumer' "); *Seig*, 2007 WL 6894503, at *4 ("[E]ven if a willfulness question is central to

this case, it does not give rise to liability independent of individualized factual determinations as to which customers were 'consumers' *and* which obtained 'receipts' containing information that should have been excluded under FACTA" (emphasis added)); *Evans*, 2007 WL 7648595, at *3 (same). Toys does not contend that only some receipts printed during the relevant period were noncompliant, nor does it assert that only some customers were given receipts. Compare *Najarian*, 2007 WL 4682071, at *1 (concluding that the court would have to determine which type of receipt each class member received because, "[d]epending on how a customer returns the vehicle, Defendants issue one of two forms of receipts at the time of return.... While some Rental Agreement Receipts issued during the Class Period contained Prohibited Information, those Rover Receipts issued during the same period did not").

Finally, the court notes that the defendants in several of the cases in which predominance was found lacking offered services frequently used by businesses, and thus likely processed many more transactions involving a company credit card than would be usual for a business like Toys. In *Najarian*, for example, the defendant was a rental car service. Logic compels the conclusion that a rental car company does a large amount of business with companies or business travelers, many of whom use company credit cards.[71] Toys has neither argued nor adduced evidence that a significant number of transactions at its stores involve the use of company credit cards, nor does such an argument seem credible. While, as noted, certain transactions at Toys stores may involve products purchased for use in business, it is probable that the bulk of the transactions are personal. Therefore, it should be relatively easier to determine whether a customer used a consumer credit card here than in the case of a defendant that caters to business customers. Given this, the court concludes that common questions as to whether Toys print-

---

**71.** The defendant in that case was Avis Rent-a-Car. In its 2012 10–K filing, Avis reported that "[i]n 2011, Avis derived approximately 57% and 43% of its car rental time and mileage revenue from commercial and leisure customers, respectively." Avis Budget Group, Annual Report (Form 10–K) at 5 (Feb. 29, 2012).

ed noncompliant receipts and whether it did so willfully predominate over individual issues.

### F. Conclusion Regarding Rule 23(b)(3)

Based on the foregoing analysis, the court finds that the predominance and superiority requirements of Rule 23(b)(3) are satisfied.

### III. CONCLUSION

For the reasons stated, the court grants plaintiffs' motions for class certification. In *Edwards*, the court certifies a class comprised of all consumers to whom, after December 3, 2006, Toys provided an electronically printed receipt at the point of a sale or transaction in California, which contained more than the last five digits of the person's credit or debit card number. In *Ellis*, it certifies a class of all persons in the United States, except California, to whom Toys provided an electronically-printed receipt at the point of a sale or transaction from October 27, 2006 through January 5, 2007, which displayed more than the last five digits of the purchaser's credit card or debit card number.